Otto E. VAN SCHAICK, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 82–2263–15.

United States District Court,
D. South Carolina,
Columbia Division.

Nov. 22, 1983.

**1024**

J. Leeds Barroll, IV, Columbia, S.C., for plaintiff.

John B. Grimball, Asst. U.S. Atty., Columbia, S.C., for defendant.

## ORDER

HAMILTON, District Judge.

This is an action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680, and the Fifth, Sixth, and Eighth Amendments to the Constitution of the United States. This action arises out of the arrest and confinement of the plaintiff during the period May 20–29, 1980.[1] The plaintiff contends that actions by or on behalf of the United States of America caused him to be falsely imprisoned, deprived him of his liberty without due process in violation of the Fifth Amendment, violated his rights (1) to reasonable bail under the Eighth Amendment and (2) his right to be informed of the nature and causes of the charges against him under the Sixth Amendment.[2]

The case came on for trial before the court sitting without a jury on October 12, 1983. At the conclusion (October 13, 1983) of the cases as presented by plaintiff and defendant, the court, pursuant to Rule 614 of the Federal Rules of Evidence, directed that additional witnesses be called for interrogation by the court concerning their knowledge of certain issues in dispute. The trial was resumed and completed on November 7, 1983.

After hearing and receiving the evidence, reviewing the exhibits and briefs of counsel, and studying the applicable law, this court makes the following findings of fact and conclusions of law with its order. Rule 52, Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

1. The plaintiff, Otto E. Van Schaick, is a 69 year old free lance charter pilot and instructor working out of Eustes, Florida.

---

1. By Consent Order filed October 12, 1983, the action against the defendant, ABC Bonding Agency, Inc., was dismissed with prejudice. See paragraph 10 of plaintiff's First Claim and the Third Claim through the Sixth Claim of the complaint.

2. The plaintiff asserted a cause of action for defamation of character in the Seventh Claim of the complaint. Inasmuch as the United States has not waived its sovereign immunity, 28 U.S.C. § 2680(h), to a tort sounding in libel and slander, this cause of action is dismissed.

The plaintiff served as an aviator both for the Air Force (1936–1939) and then for the Navy (1942–1946 and 1951–1957). From 1960 until 1974, when he retired, the Martin-Marietta Corporation employed the plaintiff as an inspector. Plaintiff has been self-employed since then and, in May, 1980, was a free lance pilot, instructor, and instrument pilot.

2. Aviation Biz hired plaintiff to fly a charter from Gainesville, Florida, to Greensboro, North Carolina, on May 20, 1980. The plaintiff accepted the charter and on May 20, 1980, picked up the airplane,[3] which was owned by Lake Aviation, Inc., and leased by Aviation Biz. The Plaintiff, with the five year old daughter[4] of his girl friend Joan L. Corley, first flew from Eustes, Florida, to the airport at Gainesville, Florida. He then flew to a small airport west of Gainesville where he filled the plane's tanks with fuel and met his four adult passengers. Plaintiff proceeded toward Greensboro with the four passengers. A line of thunderstorms forced them to land in Florence, South Carolina, that afternoon.

3. Plaintiff was not aware that the four adult passengers were attempting to smuggle one hundred thousand (100,000) quaaludes into North Carolina for a prearranged sale. The plaintiff did not know either the purposes of the trip or the nature of the contents of the passengers' luggage. The smugglers did not know that S. Chevez, the person to whom they were going to sell the drugs, had been arrested by agents of the Drug Enforcement Agency (DEA) and the North Carolina State Bureau of Investigation (NCSBI) on May 17, 1980. Chevez, in cooperation with and under the direction of DEA Agent Odis Rousseau and NCSBI Agent Robert H. Clark, arranged for the drug transaction in Greensboro.

4. After the plane had been forced to land in Florence, the four smugglers, using the plaintiff's credit card, rented a car at the airport. The smugglers unloaded from the plane four suitcases containing the quaaludes. After the plaintiff serviced the plane and secured it for the night, he left the airport with the four smugglers. They dropped him off at the Holiday Inn (now a Quality Inn) in downtown Florence. The smugglers then drove to Greensboro and, as previously arranged, "sold" the quaaludes to Agents Rousseau and Clark. The agents promptly arrested them on charges of conspiracy to distribute and distribution of a Schedule II Controlled Substance. 21 U.S.C. §§ 841(a)(1) and 846.

5. As the smugglers were driving to Greensboro, DEA Agent Odis Rousseau contacted Deputy Wayne Howard in Florence, South Carolina. Howard is and was at that time a deputy sheriff for Florence County, South Carolina. Agent Rousseau asked him to locate both the plane and the pilot and find out the pilot's identification. Howard called Officer Jerry C. Michell, a Florence City Policeman, and asked him to meet him at the airport. Through their investigation they located the plane and discovered that the pilot was Otto E. Van Schaick, the plaintiff herein. The officers also determined that the plaintiff was at the Holiday Inn in downtown Florence. Deputy Howard relayed this information to DEA Agent Rousseau who in turn relayed the information to David Smith, the Assistant United States Attorney (AUSA) for the Middle District of North Carolina, who was coordinating the joint federal-state drug task force.

6. AUSA Smith, DEA Agent Rousseau and NCSBI Agent Clark, under the circumstances, justifiably suspected that the plaintiff was a member of the drug conspiracy along with the four smugglers arrested earlier in the day in Greensboro. They

---

**3.** Federal agents seized the airplane because of its use in transporting drugs. The plane was forfeited to the United States by order of this court on May 21, 1982. *United States of America v. One 1967 Model Piper Aztec Twin Engine Aircraft, Identification Number PA 23250, its En-* *gines, Tools, Appurtenances, and Equipment,* No. 80–1087 (D.S.C. May 21, 1982).

**4.** The daughter's presence having no relevance to this action, these findings of fact will not refer to her.

were concerned that plaintiff, upon learning of the arrest of his passengers, would promptly flee. To avoid his fleeing, it was decided to authorize his arrest by Deputy Howard and Officer Michell, who agreed to make the arrest only after receiving written authorization from these federal officials. AUSA Smith, who had the ultimate authority to authorize the arrest, decided that the plaintiff should be arrested and authorized the following telex:

> PD Florence SC
> ATT: Wayne Howard or Jerry Michle
> This is *your authority to arrest* and take into custody the following subject: Otto Van Schaick W/M. Home Add/1805 E. Orange Ave., Eustes, Fla. (Address not confirmed) Subject is currently staying at the Holiday Inn, your city. It is also requested that you seize the following aircraft: Piper Aztec Twin Engine Tail Number N6410Y. This aircraft will be parked at a private airstrip in Florence, S.C. Please do not search or disturb the above aircraft in any manner. The aircraft will be processed for fingerprints *by DEA*. Please maintain custody of the aircraft from seizure until agents from DEA, Columbia, SC arrive at your location. Request is made due to violations of the following statutes: *Title 21 USC 846*, Conspiracy to Distribute a Controlled Substance. DEA Case Nbr/GE 80–0007 SBI Case Nbr/144–M–17–172 (SEU) *Auth/Assistant U.S. Attorney David Smith, U.S. Att. Office, Middle District, Greensboro, N.C.* (emphasis added).

7. In authorizing the arrest of plaintiff, AUSA Smith and DEA Agent Rousseau contemplated that plaintiff would be arrested pursuant to the authorization contained in the telex. The telex was authority to Deputy Howard and Officer Michell to arrest plaintiff for the federal authorities. It was further contemplated by AUSA Smith and DEA Agent Rousseau that plaintiff would be arrested on "convenience" charges and held until federal charges could be filed and served on plaintiff, at which time any state charges would be dismissed or dropped in favor of prosecution by the United States. The sole purpose of the "convenience" state charges was to get the plaintiff in custody pending the filing of federal charges against him.

8. Deputy Howard and Officer Michell arrested plaintiff on the evening of May 20, 1980, at his motel in Florence pursuant to the authority conferred on them by the telex. They would not have arrested plaintiff without the authority conferred on them by the telex. In making the arrest without a warrant the officers were acting on behalf of the United States Government. As arresting officers, neither Deputy Howard nor Officer Michell intended that any state or local charges would be preferred against plaintiff. Upon arresting plaintiff pursuant to the authority of the telex and booking him on May 20, 1980, at the Florence County Detention Center (Detention Center), Deputy Howard and Officer Michell considered their involvement with the plaintiff to have ended. They considered plaintiff charged with offenses against the United States and that federal agents would handle subsequent proceedings against plaintiff.

9. By authorizing the arrest of plaintiff pursuant to the authority conferred on Deputy Howard and Officer Michell in the telex, AUSA Smith and DEA Agent Rousseau vested Deputy Howard and Officer Michell with the power and authority to act for the United States as United States law enforcement officers.

10. Plaintiff was arrested by Deputy Howard and Officer Michell for the United States, specifically for DEA Agent Rousseau, for an alleged violation of 21 U.S.C. § 846. No state charges were ever filed against plaintiff. Solely from the independent investigation of Deputy Howard and Officer Michell there was no probable cause for arresting plaintiff for any state offenses. However, based on the information supplied to Deputy Howard and Officer Michell by DEA Agent Rousseau, probable cause would have existed for the arrest of plaintiff on state charges similar to 21 U.S.C. § 846.

11. At the Holiday Inn, after Deputy Howard and Officer Michell arrested the plaintiff, they read to him the telex to explain why they were arresting him. These county and city officers had no other basis for arresting the plaintiff.

12. The two officers then drove the plaintiff to the Detention Center. There Captain Joseph Ford booked the plaintiff at 11:10 p.m. The official jail record card has unexplicably been misplaced or destroyed. Ford's record, a copy of the docket book, indicates that he booked the plaintiff for conspiracy to violate South Carolina drug laws and that plaintiff was to be held for the F.B.I. The arresting officers normally furnish this information when booking prisoners at the jail. Notwithstanding this information as entered in the docket book, the evidence conclusively establishes, and the court so finds, that plaintiff was arrested for and on behalf of the United States by Deputy Howard and Officer Michell acting pursuant to the authority of the telex.

13. The record also has noted on it the names of Magistrate Smith, a Florence County Magistrate, and Magistrate Swearingen, a Federal Magistrate located in Florence.

14. The next morning, on May 21, 1980, the plaintiff was taken before Magistrate William McLeod, the chief magistrate for Florence County, and a bond was set. The only evidence of this bond was from the plaintiff's testimony. No records indicate that a bond had been set. Neither Magistrate Smith, to whom the case was ostensibly assigned, nor Magistrate McLeod, the chief magistrate in Florence County, before whom the plaintiff was taken, recall seeing this plaintiff or setting bond for him.

15. Also on May 21, 1980, AUSA Smith went before a Federal Magistrate in North Carolina and had a warrant and complaint issued against the plaintiff. These papers were transmitted to the Marshal's Office in Columbia, South Carolina, by the Marshal's Office in North Carolina.

16. On May 22, 1980, the Marshal's Office in South Carolina, believing the plaintiff to be in state custody, served a detainer on the Detention Center. This detainer was shown to plaintiff. No federal warrant was ever served on the plaintiff.

17. On May 22, 1980, Agents Rousseau and Clark went to Florence to get a search warrant for the plane, to search the plane, and to interview the plaintiff. These agents talked with Deputy Howard and Officer Michell. They explained the entire drug investigation to them and advised them that DEA would complete the investigation and prosecute the plaintiff. They asked Deputy Howard and Officer Michell who the federal magistrate in Florence was and where he was located. Rousseau met twice with the Federal Magistrate in Florence. They did not ask Deputy Howard or Officer Michell about any state charges or about any arraignment of the plaintiff or about any preliminary hearing for the plaintiff. DEA Agent Rousseau photographed and fingerprinted plaintiff and completed DEA Form No. 202 as a part of the administrative details of the DEA investigation. DEA Agent Rousseau did not serve a federal warrant on plaintiff and he did not take plaintiff before a federal magistrate.

18. Agents Rousseau and Clark tried to talk with the plaintiff. He refused to answer their questions without an attorney being present. The agents then went back to Greensboro.

19. On May 23, 1980, the plaintiff, through Joan Corley who had come to Florence from Florida to help him and to pick up her daughter, made arrangements with the ABC Bonding Company to post his ten thousand ($10,000) dollar "state bond." The plaintiff and Ms. Corley were repeatedly told that because of the impending federal charges it made no difference whether or not he made the "state bond." Finding that plaintiff was arrested by Deputy Howard and Officer Michell for the federal government, and that no state charges were filed or pending against plaintiff, the Florence County Magistrates had no jurisdiction and the ten thousand ($10,000) dollar "state bond" purportedly set was invalid and of no consequence. At the time this

"state bond" was purportedly set, plaintiff had been arrested on federal charges by Florence County and City officers acting on behalf of the United States Government. Florence County Magistrates had no authority or jurisdiction to set bond for the plaintiff who was in federal custody.

20. During the period of his confinement, May 20–29, 1980, plaintiff never had direct contact with any U.S. Marshal. The "state bond" of ten thousand ($10,000) dollars was never posted.

21. On Friday afternoon, May 23, or Saturday, May 24, 1980, AUSA Smith determined that plaintiff was not a member of the conspiracy to distribute the illegal drugs. Over the weekend AUSA Smith was involved with drafting the indictment against the four passengers-smugglers arrested in Greensboro. This indictment was presented to a federal grand jury in the Middle District of North Carolina on Tuesday, May 27, 1980. A true bill was returned, with plaintiff's name having been dropped from the indictment as originally drafted by AUSA Smith. Having determined that the charges against plaintiff should be dropped, AUSA Smith on May 28, 1980, advised Dudley Saleeby, the solicitor for Florence County (12th Judicial Circuit), that the federal charges against plaintiff were being dismissed. AUSA Smith authorized the release of plaintiff and plaintiff was released from custody on May 29, 1980, at approximately 7:30 p.m. All federal charges against plaintiff were dismissed on May 29, 1980.

22. Besides a magistrate who can dismiss a warrant at a preliminary hearing for a lack of probable cause, Solicitor Saleeby of Florence is the only judicial officer in Florence who could have dismissed any state charges brought against the plaintiff in the jurisdiction of the 12th Judicial Circuit of South Carolina. Saleeby had no records of this case ever coming through his office. He never dismissed any state charges. Because plaintiff was arrested without a warrant, a charging paper would have to follow the plaintiff from the magistrate to the clerk of court to the solicitor. Saleeby never received such a charging paper either before or after the plaintiff's release.

23. The plaintiff was in contact with his attorney in Florida or his attorneys in Florence during the length of his detention. His attorneys in Florence never discovered the existence of any state charges. Deputy Howard in talking with plaintiff's local attorneys, showed them a copy of the telex as his authority for having arrested the plaintiff. The plaintiff was released because of actions initiated by AUSA Smith.

24. The Detention Center is a contract detention facility for the United States. The Detention Center bills the United States at a daily rate for each federal prisoner kept there. No bill was ever received for the plaintiff's incarceration. Nevertheless, Deputy Howard and Officer Michell arrested plaintiff for the United States under the direction of officials of the United States while acting as temporary law enforcement employees of the United States. The plaintiff was in federal custody.

25. Following his release from custody on May 29, 1980, plaintiff cooperated fully with the federal government and testified on behalf of the prosecution at the trial of the four passengers-smugglers.

26. During the period of his confinement, from May 20 to May 29, 1980, the plaintiff never requested a preliminary hearing on the state charges. He also never requested to appear before a federal magistrate.

## CONCLUSIONS OF LAW

The plaintiff asserts that this court has jurisdiction of this matter pursuant to 28 U.S.C. § 1346(b) and the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Section 1346(b)[5] is

---

5. Section 1346(b) states:
   ... the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful

a waiver of the sovereign immunity of the United States. The United States, as sovereign, may not be sued for damages unless the United States, through Congress only, expressly waives its sovereign immunity. *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Furthermore, "statutes which waive immunity of the United States are to be construed strictly in favor of the sovereign." *McMahon v. United States*, 342 U.S. 25, 27, 72 S.Ct. 17, 19, 96 L.Ed. 26 (1951).

The plaintiff alleges that the defendant, through its law enforcement or investigative officers, falsely imprisoned him according to the laws of South Carolina. This court has jurisdiction to hear those claims pursuant to 28 U.S.C. §§ 1346(b) and 2680(h).

█ By raising claims against the United States for alleged violations of the Fifth, Sixth, and Eighth Amendments, the plaintiff is attempting to raise *Bivens* [6] claims against the United States. This court has no jurisdiction to hear these claims under 28 U.S.C. § 1331 (cited by the plaintiff in his supplemental trial brief as a basis for jurisdiction) or the Constitution. Neither § 1331 nor the Constitution waives the sovereign immunity of the United States. *Sellers v. United States*, 569 F.Supp. 1149, 1154 (N.D.Ga.1983) (citing *Garcia v. United States*, 666 F.2d 960, 966 (5th Cir.), *cert. denied* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982)); *E.g., Holloman v.*

*Watt*, 708 F.2d 1399, 1401–02 (9th Cir. 1983); *Keene Corporation v. United States*, 700 F.2d 836, 845 n. 13 (2nd Cir. 1983); *Radin v. United States*, 699 F.2d 681, 684–85 (4th Cir.1983); *Sanchez-Mariani v. Ellingwood*, 691 F.2d 592, 596 (1st Cir.1982); *Laswell v. Brown*, 683 F.2d 261, 267–69 (8th Cir.1982).

Furthermore, this court doubts that it has jurisdiction over any *Bivens* claims for constitutional torts under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680. *Carlson v. Green*, 446 U.S. 14, 21–23, 100 S.Ct. 1468, 1473–1474, 64 L.Ed.2d 15 (1980); *Birnbaum v. United States*, 588 F.2d 319, 327–28 (2d Cir.1978); *Brown v. United States*, 653 F.2d 196, 199–202 (5th Cir.1981); *See, Boda v. United States*, 698 F.2d 1174, 1176 (11th Cir.1983); *But see, Norton v. United States*, 581 F.2d 390, 392–95 (4th Cir.1978).

In *Norton* the Fourth Circuit stated that the "amendment to 2680(h) [7] is clearly intended to waive the federal government's sovereign-immunity defense in suits brought to redress violations of the Fourth Amendment committed by federal law enforcement officers. *See* S.Rep. No. 93–588, 93rd Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 2789." *Norton*, 581 F.2d at 393. The Fourth Circuit explained that the *Bivens* decision created an intentional tort against federal officials in their individual capacity. However, such an action against the United States before the 1974 amendment to § 2680(h)

---

act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

**6.** *Bivens v. Six Unknown Named FBI Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**7.** Section 2680(h) states:
   The provisions of this chapter and section 1346(b) of this title shall not apply to—
   (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* That,

with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of the chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.
The amendment added the language starting with *"Provided."*

was barred by the sovereign immunity of the United States. According to the Fourth Circuit, Congress used § 2680(h) to waive the sovereign immunity of the United States for intentional constitutional torts committed by federal investigative or law enforcement officials. *Id.* at 394. Nevertheless, under 28 U.S.C. § 1346(b) and §§ 2671 to 2680 and subsequent case law it was clear that

> Congress did not intend to create substantive federal law in enacting FTCA; it limited the liability of the United States to vicarious liability for the acts or omissions of its employees which, in turn, were tortious under the law of the place where the acts or omissions occurred. Both the precipitating tort and the scope of the government's vicarious liability were to be governed by "the law of the [state] where the act or omission occurred." *See Laird v. Nelms,* 406 U.S. 797, 801, 92 S.Ct. 1899 [1901], 32 L.Ed.2d 499 (1972); *Richards v. United States,* 369 U.S. 1, 6–7, 82 S.Ct. 585 [589–590], 7 L.Ed.2d 492 (1962).

*Id.* Indeed, the Fourth Circuit considered that the amendment may not even apply to a tort created by *Bivens,* in part because *Bivens* created a *federal* tort. *Id.* Nevertheless, the court found that the *"Legislative history* makes clear that the federal government may be sued for *Bivens* torts committed by its agents...." *Id.* at 395. In explaining this the *Norton* court stated:

> The statutory language, as well as the placement of the waiver within the confines of FTCA, suggests that its applicability is limited to suits alleging certain state-created intentional torts committed by federal law enforcement officers. The legislative history, however, makes clear that the 1974 amendment was viewed by Congress as "a counterpart to the *Bivens* case...." S.Rep. No. 93–588, *supra,* [1974] U.S.Code Cong. & Admin.News at 2791.

*Id.* [footnotes omitted].

In *Norton* the government did not contest the applicability of the 1974 amendment in waiving the sovereign immunity of the United States. *Id.* at 392. The discussion by the Fourth Circuit was important in its holding that the United States could assert the agents' good faith as a defense to the *Bivens* action. *Id.* at 397. Irrespective of this holding is whether that portion of *Norton* which finds a waiver of sovereign immunity for constitutional (*Bivens*) torts is still tenable after *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

In *Carlson* the Supreme Court considered two questions: "(1) Is a remedy available directly under the Constitution given that respondent's allegations could also support a suit under the Federal Tort Claims Act? And (2) if so, is survival of the cause of action governed by federal common law or by state statutes?" *Carlson,* 446 U.S. at 17, 100 S.Ct. at 1470. An action against the United States would have been cognizable under the FTCA for an intentional medical malpractice. *Green v. Carlson,* 581 F.2d 669, 675 (7th Cir.1978), *aff'd sub nom. Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Yet, the plaintiff did not sue the United States. The plaintiff sued the federal officials for violations of her son's constitutional rights under the Eighth Amendment. *Id.* at 670–72.

In deciding that the plaintiff could maintain a *Bivens* action the Court discussed why a *Bivens* remedy is more effective than a FTCA remedy. *Carlson,* 446 U.S. at 21–23, 100 S.Ct. at 1473–1474. As its last reason the Court stated that

> ... an action under FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward. 28 U.S.C. § 1346(b) (United States liable "in accordance with the law of the place where the act or omission occurred"). Yet it is obvious that the liability of federal officials for violations of citizens' constitutional rights should be governed by uniform rules. See Part III, *infra.* The question whether respondent's action for violations by federal officials of federal constitutional rights should be

left to the vagaries of the laws of the several States admits of only a negative answer in the absence of a contrary congressional resolution.

Plainly FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy.

In *Brown v. United States,* 653 F.2d 196 (5th Cir.1981), the Fifth Circuit construed the above quoted language from *Carlson* and § 1346(b) of the FTCA to mean that "the liability of the United States under the Act arises only when the law of the state would impose it. As a 'creation of federal law,' *Carlson,* 446 U.S. at 23, 100 S.Ct. at 1474, 64 L.Ed.2d at 26, a *Bivens* action cannot be brought under the Act." *Brown,* 653 F.2d at 201.

In a footnote to this the *Brown* court explained that the Fourth Circuit in *Norton* had concluded that the 1974 amendment was a " '*sui generis*' provision allowing *Bivens* actions against the United States unrelated to other provisions of the Federal Tort Claims, presumably including § 1346(b). *See* 581 F.2d at 395 n. 8." *Brown,* 653 F.2d at 201 n. 4. The Fifth Circuit then concluded that that portion of *Norton* was no longer tenable because of *Carlson. Id.*

The rationale and reasoning in *Brown* is persuasive, but this court is bound by *Norton* until the Fourth Circuit interprets the effect of *Carlson v. Green* on *Bivens* torts asserted under the FTCA. At present this court does not believe that a *Bivens* action may be brought against the United States through § 2680(h) of the FTCA. *Bivens* is a federal tort. The 1974 amendment to the FTCA subjects itself to the provisions of § 1346(b). Section 1346(b) and the case law interpreting it restrict the FTCA to causes of action arising under state law. *Brown,* 653 F.2d at 201; *Birnbaum v. United States,* 588 F.2d 319, 327–28 (2d Cir.1978) *aff'g* 436 F.Supp. 967 (E.D.N.Y. 1977). This court doubts that it has jurisdiction over plaintiff's constitutional claims.

■ Nevertheless, even if this court were to have jurisdiction over the constitutional claims without regard to *Carlson, Brown* and *Birnbaum,* the United States is not liable under *Norton* because all the officers involved acted in good faith. *Norton,* 581 F.2d at 395. This entire episode was a comedy of errors by all the law enforcement personnel involved. The Florence City and County officers who became agents of the United States did not understand their duty to take the plaintiff before a Federal Magistrate. They also believed that the DEA would handle all other procedural requirements subsequent to their arrest of the plaintiff. The DEA Agent, Odis Rousseau, although he came down to Florence and could easily have brought the plaintiff before the federal magistrate, believed that the federal marshals in South Carolina would handle the matter when they served the plaintiff with the warrant coming out of North Carolina. The marshals in South Carolina, believing that the plaintiff was in state custody, served the plaintiff with a detainer pursuant to procedures prescribed in their manual. Although this court finds that the detention was unreasonable, it cannot find any bad faith involved with the actions of these law enforcement officials. The good faith and reasonable belief in the legality of their conduct on the part of the law enforcement officers would constitute a bar to any *Bivens* tort even if such a cause of action could be asserted under the FTCA. *Norton,* 581 F.2d at 397.

■ Nevertheless, the United States could be liable for the actions of Howard, Michell, and Rousseau in violating plaintiff's constitutional rights. For such liability to exist South Carolina would have to recognize a private cause of action for damages for constitutional deprivations. 28 U.S.C. §§ 1346(b) and 2680(h); *E.g., Birnbaum v. United States,* 588 F.2d 319 (2d Cir.1978) *aff'g* 436 F.Supp. 967 (E.D.N.Y. 1977). This court, while believing that South Carolina would recognize such a cause of action, need not and does not reach that issue. This court finds that the

United States is liable for falsely imprisoning the plaintiff.

The plaintiff does not contest that probable cause existed for his arrest. That being so, the United States cannot be liable for false *arrest. Prosser v. Parsons*, 245 S.C. 493, 498, 141 S.E.2d 342, 346 (1965). The liability of the United States in this case is based on the misconduct of Deputy Howard, Officer Michell, and DEA Agent Odis Rousseau, after the lawful arrest, in failing to take the plaintiff before a federal magistrate within a reasonable time. *See, Westbrook v. Hutchinson*, 195 S.C. 101, 111–12, 10 S.E.2d 145, 149 (1940); *See also, Thomas v. Colonial Stores, Inc.*, 236 S.C. 95, 100, 113 S.E.2d 337, 340 (1960). The South Carolina Supreme Court in *Westbrook* found a private citizen liable for failure to take an arrested person before a magistrate. However, it has never addressed the issue with regard to the liability of a law enforcement official. Nevertheless, this court believes that if the South Carolina Supreme Court were presented with this issue under these facts it would recognize a cause of action for false imprisonment after a valid arrest.

The Restatement of Torts (2d) recognizes that:

> Any subsequent misconduct of one who has taken custody of another by a privileged arrest makes him subject to liability to the other only for such harm as is caused by such misconduct, and does not make him liable for the arrest, or for detention prior to the misconduct.

Restatement (Second) of Torts § 136 (1965). In Comment e the Restatement states:

> If the actor unnecessarily prolongs the other's custody beyond the period within which he could by due diligence bring the other before a court or give him into the custody of a third person authorized to take the custody of him, the actor is liable for ... so much of the confinement as is unnecessary and caused by the actor's failure to use due diligence....

*Id.* Comment e.

▆ That this applies to law enforcement officials cannot be denied. 32 Am.Jur.2d *False Imprisonment* § 25 (1982); *Moran v. City of Beckley*, 67 F.2d 161, 163–64 (4th Cir.1933). Section 22–5–200 of the South Carolina Code clearly puts a duty on a sheriff making an arrest without a warrant to take the arrested person before a magistrate forthwith. S.C.Code Ann. § 22–5–200 (Law.Co-op. 1976). A private individual can be held liable for failing to take a person to a magistrate regardless of his knowledge of his duty to do so. *Westbrook*, 195 S.C. at 111–12, 10 S.E.2d at 149; *See also, Thomas*, 236 S.C. at 100, 113 S.E.2d at 340. It would be incongruous for a law enforcement official, with a statutory duty to do so, not to be held liable. Accordingly, this court finds that a false imprisonment may arise in South Carolina for failure to take an arrested person before the proper magistrate within a reasonable period of time. 32 Am.Jur.2d *False Imprisonment* § 25 (1982); Restatement (Second) of Torts § 136 and § 136 Comment e (1965); *Moran*, 67 F.2d at 163–64; *See, Westbrook*, 195 S.C. at 111–12, 10 S.E.2d at 149; *See also, Thomas*, 236 S.C. at 100, 113 S.E.2d at 340.

The evidence presented before this court shows two reasons why the United States is liable to the plaintiff under this cause of action. *First*, the United States is liable for false imprisonment because of the failure of Deputy Howard and Officer Michell to take plaintiff before a federal magistrate. *Second*, the United States is liable for false imprisonment for the failure of Agent Rousseau to do the same.

▆ Under § 2680(h), the United States is liable for any claim arising out of false imprisonment which results from acts or omissions of investigative or law enforcement officers of the United States. 28 U.S.C. § 2680(h). That section defines an investigative or law enforcement officer as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* Deputy Howard and Officer Michell are obviously investigative or law enforcement officers. The question is whether they were officers of

United States or, in effect, government employees, given that they were employed by Florence County and the City of Florence at the time of the false imprisonment. This court finds that they were Federal government employees for purposes of this action. 28 U.S.C. § 2671.

Section 2671, in pertinent part, defines an employee of the government to include "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." *Id.* David Smith, the Assistant United States Attorney for the Middle District of North Carolina, by the telex to Deputy Howard and Officer Michell authorized them to arrest the plaintiff. In so doing he made them agents of the United States for they would not have acted without the authority of the telex. The Assistant United States Attorney and the DEA agent directed Deputy Howard and Officer Michell in what they were to do—make the arrest and secure the aircraft for DEA. These officers never contemplated getting a South Carolina arrest warrant and never did so. They further understood that DEA Agent Rousseau and NCSBI Agent Clark would take over and complete the investigation. They believed that their duties were ended with the arrest and booking of the plaintiff.

As agents of the United States arresting the plaintiff for violation of Federal law, these officers had a duty to take this plaintiff before the federal magistrate in Florence. S.C.Code Ann. § 22–5–200 (Law.Coop. 1976); Federal Rules of Criminal Procedure 5. A federal magistrate, S.E. Swearingen, was present in Florence for the length of the plaintiff's detention. That plaintiff was taken before a county magistrate is irrelevant for this action because that magistrate only has jurisdiction over persons accused of violating state law. The testimony of Deputy Howard and Officer Michell conclusively establishes that this plaintiff was arrested for alleged violations of Federal law only. The county magistrate had no jurisdiction over this offense and could not set bail. S.C.Code Ann. § 22–3–540 (West Co-op. 1976).

■ Once Deputy Howard and Officer Michell took plaintiff to the Detention Center and had him booked they failed to take any further action. The plaintiff was never taken before the federal magistrate. As a result he languished in jail until 7:30 p.m., May 29, 1980, when he was released at the direction of the *Federal* authorities. Under South Carolina law, the United States is liable for the false imprisonment caused by Deputy Howard and Officer Michell. 32 Am.Jur.2d *False Imprisonment* § 25 (1982); Restatement (Second) of Torts § 136 and § 136 Comment e (1965); *Moran v. City of Beckley,* 67 F.2d 161 (4th Cir.1933); *Anderson v. Nosser,* 438 F.2d 183, 195–96 (5th Cir.1971); *See Westbrook,* 195 S.C. at 111–12, 10 S.E.2d at 149; *See also, Thomas,* 236 S.C. at 100, 113 S.E.2d at 340.

The United States is also liable for the failure of DEA Agent Rousseau to act. Rousseau was a law enforcement officer of the United States directly in charge of this drug investigation. Rousseau had indicated to Deputy Howard and Officer Michell by telephone on the night of the arrest that a DEA Agent would come down to handle matters in Florence. On May 22, 1980, Agents Rousseau and Clark flew into Florence. They met with Deputy Howard and Officer Michell who showed them the airplane and then took them to the Detention Center. The agents asked who the federal magistrate was in Florence and what his address was. They also attempted to question the plaintiff, who refused to answer any questions without his attorney present.

Rousseau and Clark, while in Florence, procured a search warrant to search the plane from the federal magistrate. Yet, Rousseau, who went before the magistrate twice, never took the plaintiff before that same magistrate. In fact, Rousseau never even questioned Deputy Howard or Officer Michell about the charges against the plaintiff or whether he had had any hearings before a magistrate. For these omissions by Rousseau the United States is liable for

false imprisonment. *Moran v. City of Beckley,* 67 F.2d 161, 164 (4th Cir.1933) (stating that "all those who take part in so detaining a person an unreasonable length of time are liable ...." (quoting 25 C.J. 493)); 32 Am.Jur.2d *False Imprisonment* § 28 (1965).

■ The United States asserts that, under *Norton,* it can assert the good faith defenses of its officials as a defense for itself. *Norton,* 581 F.2d at 396–97; *But see, Arnsberg v. United States,* 549 F.Supp. 55, 58–59 (D.Or.1982). The United States may do so in the Fourth Circuit to defend against alleged constitutional violations. Nonetheless, this court has found the United States liable under South Carolina law and not the Constitution. South Carolina law does not allow for a defense of good faith in an action for false imprisonment. *Westbrook,* 195 S.C. at 110–11, 10 S.E.2d at 148 (1940) (quoting 190 S.C. 414, 3 S.E.2d 209: "Nor is it necessary that the wrongful act be committed with malice, or ill-will, or even the slightest wrongful intention.") Accordingly, this court finds the United States liable to this plaintiff for false imprisonment from May 21, 1980, to May 29, 1980.

■ As to his damages, the South Carolina Supreme Court has stated that there is "no market value for injured feelings or wrongful invasion of one's rights of personal dignity ... Human liberty is difficult of measurement in dollars and cents." *Wright v. Gilbert,* 227 S.C. 334, 338–39, 88 S.E.2d 72, 75 (1955); *See also, Westbrook,* 195 S.C. at 117, 10 S.E.2d at 151–52 (Stating that "the value of money in comparison with the value of the normally self-satisfied state of mind of which a man may be deprived by a wrongful invasion of his rights ... is a matter as to which reasonable men may, and do, differ widely."). With this in mind and because the United States deprived this plaintiff of his liberty for over one week, this court awards the plaintiff the amount of twenty-two thousand five hundred ($22,500) dollars.

Based on the foregoing findings of fact and conclusions of law this court finds the United States of America liable to this plaintiff for false imprisonment. This court awards the plaintiff the amount of twenty-two thousand five hundred ($22,-500) dollars. Judgment shall be entered for the plaintiff against the United States of America accordingly.